[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON
CT Page 15455 SUMMARY JUDGMENT MOTION
In this case, the plaintiffs, ITC Investments, Inc., and an employee, Stan Steinberg, have sued Employers Reinsurance Corporation (ERC). ERC has filed a motion for summary judgment as to breach of contract which is set forth in counts 16, 19 and 22; negligence, counts 3 and 6; breach of fiduciary duty, counts 9 and 12; violation of Connecticut's Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA), counts 15 and 17.
The plaintiff, ITC Investments, Inc. (ITC), is a real estate firm. In May, 1994, the defendant, Newtown Insurance Service (Newtown), represented ITC and numerous other clients of the Connecticut Association of Realtors, Inc. (C.A.R.) At that time, Newtown was the managing general agent for the defendant, National Union Fire Insurance Company (National), and ITC purchased a National professional liability policy through Newtown in May, 1994. The court has examined the policy and it was a so-called "claims made" policy covering claims first made and reported to National during the policy period from May 10, 1994 to May 10, 1995.
In the summer of 1994, National informed Newtown that it no longer wished to write policies for Connecticut. Newtown then offered to C.A.R. members, including ITC, an ERC policy. Steinberg was asked to fill out an application for this policy, which he did. The application was signed March 2, 1995. Its contents will be discussed in more detail later in this opinion, but the application represented the policy as a "claims made" policy. The application stated that the policy was to be provided on a "claims made" basis for ONLY THOSE CLAIMS THAT ARE MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE and that coverage ceases with the termination of the policy." The policy was to be in effect from May 10, 1995 to May 10, 1996. This language appears at the end of the application form with the foregoing emphasis and the document itself is entitled in bold letters, "APPLICATION FOR "CLAIMS MADE' INSURANCE POLICY FOR REAL ESTATE AGENTS AND BROKERS PROFESSIONAL LIABILITY COVERAGE."
On Page 3 of the application, two items #18 and #20 refer to "Supplemental Claims Information" — this phrase was capitalized. In #19 it stated:
 "Please note this policy will not apply to claims which any person proposed for this insurance is aware of prior to the effective date of the policy."
CT Page 15456
In #20 it says:
 "Please note this policy will not apply to circumstances which any person proposed for this insurance is aware of prior to the effective date of the policy."
This language in both #19 and #20 is not capitalized but is in a type face different from the type preceding and following it. As to #20, the "circumstances" referenced are noted to be "circumstance which may result in a claim being made against the applicant."
On April 28, 1995, ERC wrote a letter to Newtown which in part stated "prior acts exclusion with Retro Date of 5/10/94 but also said "This Proposal is subject to all terms and conditions of the policies of(ERC)." Consistent with this letter the ERC policy actually issued contained a prior act endorsement which said: "that notwithstanding any policy provision to the contrary this policy does not apply to claims against the insured arising out of any negligent act, error or omission which occurred prior to 5/10/94." The actual policy was not sent by ERC to ITC until after June 7, 1995 which was subsequent to the commencement of the policy period. On April 24, 1995, a lawyer wrote to Mr. Steinberg on behalf of the Dmochowski's who had been ITC clients and had made an offer on a home. ITC had recommended a particular company for a home inspection, arranged for the inspection in fact and it was reported to the Dmochowski's that there was no evidence of infestation. The people found there was termite infestation after they moved in. The lawyer demanded reimbursement for clearing up the problem, for inconvenience, and distress. The letter said the clients believed they had "a claim against your firm" and went on to say that if no response was received in ten days "Immediate legal proceedings would be brought." A meeting was requested and Steinberg was advised to give a copy of the letter to both his legal representative and insurance carrier. Mr. Steinberg called the lawyer denying liability; the lawyer he felt was threatening to bring suit. Steinberg got a second letter on May 5, 1995 which suggested settlement figures and said if ITC was dealing through an insurance company the lawyer would not be adverse to hiring a professional appraiser to view the damages. A series of letters and phone calls followed on various dates prior to May 10, 1995 in which the same demands were made and as to which Mr. Steinberg continued to deny responsibility. On May 11, 1995, the lawyer wrote a fifth letter to Steinberg which among other things requested the name of his attorney or representative. On May 13, Steinberg responded in a letter in which he said he would be quickly vindicated. No further communications occurred between the parties until on June 27, 1995, suit was filed. In late June or early July, Steinberg reported the claim to Newtown. Both National and CT Page 15457 ERC denied coverage and refused to defend even with a reservations of rights.
There is no claim that there was not a policy in effect between the plaintiff ITC and National for the period of May 10, 1994 and May 10, 1995. That policy styled itself as a "claims made policy" and listed as one of the "insuring agreements."
 "To pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the insured and reported in writing to the company during the policy period for any wrongful act of the insured or any other person for whose actions the Insured is legally responsible, but only if such wrongful acts occurred during or prior to the policy period.
There is no claim made here that the type of acts or failures to act that the lawyer who made certain demands against ITC as just discussed were not "wrongful acts" as defined by the National Union policy — apart, of course, from the question of their validity. Neither is there a claim that any of the "exclusions" in the National Policy would apply. This is the factual background to the various claims made by the plaintiffs arising from the denial of coverage by ERC. In any event, the various legal claims on which the lawsuit is based arise from the denial of coverage. The defendant ERC in its motion for summary judgment moves to dismiss the case, claiming as a matter of law there is no basis for the allegations made against it.
 A.
The rules to be applied on summary judgment motions are well-known. Such a motion should not be granted if there is a general issue of material fact since parties have a constitutional right to a jury trial. On the other hand, where a claim is without merit, a court should not hesitate to grant the motion since parties should not be subjected to the burden and expense of unwarranted litigation.
 B.
The court will first make some general observations about the rules of interpretation it will apply to the insurance company documents involved here including the application for the insurance and the actual policy issued by ERC. CT Page 15458
Most of the cases refer to interpretation of the insurance policy as such but the same principles should apply to the interpretation of language in the application for a policy. The added consideration, when the two documents are read together, being whether there is any resulting ambiguity from reading an application on the policy itself. In any event, it has been said that:
 "If the terms of the insurance policy are plain and unambiguous, they are to be accorded their natural and ordinary meaning . . . If they are not then the construction most favorable to the insured is to be adopted . . . when the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." Raffel v. Travelers Indemnity Co., 141 Conn. 389, 392
(1954); also see Beach v. Middlesex Insurance Co., 205 Conn. 246, 249-50 (1987).
The reason given for this view is that the insurance company and its lawyers draw up the policies and thus by the language used can "more easily prevent mistakes in meaning" so that doubts as to meaning should be resolved against the company." Giswold v. Union Labor Life Ins. Co.,186 Conn. 507, 513 (1982). On the other hand, no matter who draws up the language in insurance documents and no matter even how strong the bargaining power is of one of the parties intent on entering into a contract or actually doing so a party, insurance companies included, is entitled to enjoy and rely on the benefits of the contract it negotiated. Thus, in Hammer v. Lumberman's Mutual Casualty Co.,214 Conn. 573, 583 (1990), it was said that:
 "If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply. The language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties."
 Downs v. National Casualty Co., 146 Conn. 490, 494-95 (1959) was even more to the point. "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous because lawyers or laymen contend for different meanings." CT Page 15459
Indeed as said in McGunchey v. Aetna Casualty Surety Co.,224 Conn. 133, 137 (1992):
 "There is no presumption that language in insurance contracts is inherently ambiguous. Only if the language manifests some ambiguity do we apply the rule that ambiguous insurance contracts are to be construed in favor of insureds and to provide coverage.
 Where a judge finds ambiguity where none exists, he or she is in effect making the insurance contract instead of the parties. Such inappropriate judicial activity also occurs when a court, in order to give its own meaning to the policy, fails to construe the contract as a whole.
 A policy is to be taken as a whole, and all its relevant provisions considered in connection with each other . . . Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it. Downs v. National Casualty Co., 146 Conn. at p. 495."
The foregoing rules of interpretation are generally recognized, cf.Doctor's Co. v. Insurance Corp of America, 864 P.2d 1018, 1024 (Wyo., 1993); Ins. Corp. of America v. Dillon, Hardamon Cohen,725 F. Sup. 1461, 1465 (N.D.Ind. 1988); Exchange, et al v. LeonardUnderwriters, 323 N.W.2d 679, 681 (Ct. of App. Mich., 1982).
It should also be noted that where commercial insurance is involved, and two sophisticated entities are dealing with each other, the rule of interpreting all ambiguities against the insurer should not be woodenly applied and courts should look at what the reasonable intent of the parties was in entering into the insurance contract. State Underwritersv. Travelers Ins. Co., 803 F.2d 1308, 1314 [5] (CA 3, 1986). In the commercial insurance area involving professional liability policies, is it too heretical a notion to suggest that insurance policy language should be construed "to give a reasonable meaning that most closely reflects the probable intentions of the parties to the insurance contract . . ." Eagle Leasing Corp. v. Hartford Fire Ins. Co., 540 F.2d 1257, 1261
(CA 5, 1976). This court went on to quote from a treatise to the effect that a policy should be interpreted so "that it may stand as a reasonably practical commercial undertaking: that is, of two possible constructions CT Page 15460 that which is most reasonable from a business point of view should be taken." Id., 1261. As regards "claims made" policies the court in DetroitAutomobile Inter-Insurance Exchange, supra, said at 323 N.W.2d p. 682-83:
 "`Claims made' policies are rarely issued to the unsophisticated. There exists no good reason not to allow the insurance buying public to opt to purchase a lower priced claims — made policy, nor is there any good reason to force the insurer who issues a `claims made' policy to undertake the additional and uncontracted — for risks associated with `occurrences' policies."
 C. (1)
The court will first discuss the breach of contract claim. It is the plaintiff's position that the defendant ERC breached its contract of insurance with the plaintiff as set forth in the insurance policy it issued. The plaintiff maintains that the defendant ERC improperly denied coverage when the policy interpreted in light of the prior acts endorsement provided for coverage. In any event, it is argued that there were ambiguities in the wording of the policy especially when read in conjunction with the original application for insurance which was not as restrictive as the language of the policy as actually issued. The plaintiff maintains there was no claim made against ITC prior to the effective date of the policy and notice was given to ERC of the suit filed by the Dunochowski's during the policy period — the latter act being the effective date of the "claim." In any event, Mr. Steinberg had a good faith belief that the Dmochowski claim was unfounded and thus had no obligation to report it to any insurer under such circumstances and/or given his belief it was not properly a claim under the policy.
Furthermore, even if there was a delay in reporting the claim, coverage should still be provided under the insurance policy since Steinberg's affidavit offers facts to indicate ERC was not prejudiced by the delay to avoid compliance with its contractual obligations.
The court will try to deal with all of the foregoing issues raised by the plaintiff in opposition to the defendant's motion for summary judgment.
ERC argues it did not breach its policy obligations in denying coverage. CT Page 15461
The defendant ERC argues that this is indisputably a "claims made" policy and only covered claims made during the policy period of May 10, 1995 until May 10, 1996. ERC maintains that the letter sent by the Dunochowski's lawyer on April 24, 1995 was clearly a "claim" under the language of the policy and since it was presented prior to the date of coverage there was no coverage contracted for and the breach of contract claim against ERC must be dismissed. The defendant cites the language of the policy which at Section V (c) defines the term "claims first made against the insured" to mean:
. . . "The Insured has received notice of legal process, that a demand for money or services has been made against the insured, or that the Insured has become aware of a proceeding event or development which has resulted in or could in the future result in the institution of a claim against the insured and that notice has been given to the corporation during the period."
Under the terms of that language, the letters from the Dmochowski's lawyer, referenced previously, certainly appear to be claims. An April 24 letter demanded reimbursement for expenses incurred through what was said to be the fault of the insured "breach of contract, breach of the implied covenant, and good faith misrepresentation, negligent misrepresentation, negligence and possible CUTPA violations." The letter sets out the factual basis of the claims and requests various types of damages. If satisfactory response to the letter was not received in ten days, "immediate legal proceedings" were threatened.
ERC argues that the breach of contract claim must be dismissed based on the foregoing and cites the case of City of New London v. General StarIndemnity Co., 1995 WL 684, 792 (Conn.Super. 1995, Hurley, J.). There the court granted the defendant's summary judgment motion because one month before the effective date of the policy the plaintiff, City, had received an insured party's notice of intention to sue which was statutorily required if a claim for damages were to be made against a municipality. The General Star court reasoned that such a notice was certainly a "claim" and since it predated the policy period in the "claims made" policy before it the defendant did not have to provide coverage.
The plaintiff has raised numerous objections to the granting of the motion for summary judgment which the court must confess that it concludes are based on a misunderstanding of the nature of the claims made policy as opposed to an occurrence policy. Before dealing with the specific issues raised by the motion for summary judgment and the response CT Page 15462 to it, it would be helpful to discuss claims — made policies, their purposes, effect and how they differ from the other form of professional liability policies known as occurrence policies.
The cases and commentators have explained the differences between these two types of policy.
 § 430. An occurrence type of liability policy protects the policyholder from damages resulting from acts occurring during the period in which the policy is in effect, regardless of when the claim is brought. pp. 159-59 . . . A discovery or claims made policy is one in which indemnity is provided no matter when the alleged error or omission or act of negligence occurred provided the misdeed complained of is discovered and the claim for indemnity is made against the insurance company during the policy period. A claims made type of liability policy protects the policyholder only against claims made during the life of the policy and claims or potential claims which are not made or reported during the policy are not covered. Under a claims made policy the insurance carrier agrees to assume liability for any acts or omissions, even those made prior to the inception of the policy as long as notice is given, or the claim is made within the policy period." 45 CJS § 430: "Insurance"
 "The claims made form evolved because of the problems for the insurer and insured with the occurrence form. For the professional, a "claim' is more understandable as the insurable event than an "act or omission' and the date coverage ends is certain. The policy is more affordable than the occurrence form. For the insurer, the claims made forms also offers more certainty in coverage interpretation and enables an insurer to more accurately project its losses at the close of the policy year, especially if the claim must be reported by that time." Legal Malpractice, 4th Ed., Mallen Smith, Vol. 4, § 33.11, pp. 316-17.
Or to be more exact, . . . "notice provided pursuant to the claims reporting requirements permits the insurer to more accurately fix reserves for future liabilities and to compute premiums with greater certainty. The resulting reduction in the insurer's potential liability CT Page 15463 exposure reduces the cost of coverage under the policy." Insurance Law Practice, Appleman, Vol. 8, Supplem., 1996-1997 Pocket Part § 4731.
Zuckerman National Union Fire Insurance Company, 495 A.2d 395 (NJ, 1985) is a leading case in this area. It notes occurrence policy premiums "have been proven to be grossly inadequate to cover the inflationary increase in the cost of settling claims asserted years later." This is the result of inflation but is also due to "new theories of recovery in tort law and increased consumer awareness." Claims made policies allow companies to "calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point, usually the policy termination date . . . This may result in lower rates for the insured." Another benefit to the insured is that "since coverage is purchased on a contemporary basis, it can afford protection in current dollars for liability that may be based on negligence that occurred years earlier." Id., pp. 399-401. On Page 400, Zuckerman cites the "vast majority of cases" that have held that claims made policies do not violate public policy. Also see American Home Assurance v. Abrams, 69 F. Sup.2d 339,346-47 (D.Conn. 1999). One state, Kansas, seems to require by statute that in the professional liability area occurrence policies be read as claims made policies. Missouri Medical Association v. Wong, 676 P.2d 113,120-21 (Kan., 1984).
The court will discuss the issues raised in this case based in part at least on the foregoing discussion.
There is no doubt that the policy as issued by ERC was a claims made policy and that the application Mr. Steinberg filled out in March of 1995 informed him that he was applying for a claims made policy. The ERC policy was to replace a National Union policy which was also a claims made policy and Steinberg had no reason to expect he would be offered anything else than an equivalent policy with equivalent protections. The application states the policy is a claims made policy. Immediately before this signature line at the end of the application, it says in bold type that the policy applied for was of the claims made variety and only applied to "claims made against the insured while the policy is in force."
 (3)
As to the breach of contract allegation, the court will first discuss the issue as to whether a "claim" was made under the "ERC" policy and whether there was any ambiguity in the term as used by the insurer.
The plaintiff appears to make something of the fact that he was not sent the policy until after the policy inception date on May 10, 1995 CT Page 15464 — he received it in June. The policy clearly defines "claim first made" but the application for insurance uses the word "claim" throughout and nowhere defines that term. The application was signed March 2, 1995, the lawyer's letter arrived April 24, 1995, the National Union policy ran to May 10, 1995, the ERC policy was to commence on May 10, 1995 and ran to May 10, 1996.
Concentrating on the application itself and the fact that "claim" is not defined therein, the overwhelming weight of authority hold that such a failure of definition does not create ambiguity. Why? Because these courts give the word its common meaning. In Safeco Title Ins. Co. v.Gagnon, 774 P.2d 30 (Wash., 1989), the court was faced with a claims made policy that did not define the word claim. The court refused to hold that therefore the word and thus the policy was ambiguous. It went on to say: "`Claim' ordinarily means a demand on the insured for damages resulting from the insured's alleged negligent act or omission . . . We conclude that the plain, ordinary meaning of claim is a demand for compensation. Id., p. 33. In Edenberg Consolidated v. INA, 806 S.W.2d 910 (Tex.App. 1991), the word "claim" was not defined; the company denied coverage saying claim for which coverage was sought was not made during the policy period. The court turned to the dictionaries, citing Black's Law Dictionary which defines claim as a "Demand for Money or Property." The court held that a claim was made against the insured Edenberg Consolidated, a school district, by a teacher within the policy period because in that period the teacher had appealed his termination to the Texas Education Agency asking for reinstatement, back pay and damages. The court held that any reasonable interpretation of the word `claim' unambiguously encompasses these actions. Id. p. 913. Also see EvanstonIns. Co. v. GAB Business Services, 521 N.Y.S.2d 692 (1987) where "claim" was not defined in this type of policy. The court said: "Reading the contract as a whole the parties intended that a claim must relate to an assertion of legally cognizable damage and must be a type of demand that can be defended, settled and paid by the insurer. Id., p. 695. In CIPSv. American Empire Surplus Lines, 642 N.E.2d 723 (Ill.App. 1994), the court refused to find the word "claim "ambiguous" — the absence of a definition does not render a policy term ambiguous." Id., p. 726. The court found no claim had been made during the policy period and so held by adopting the definition of "claim" used in Evanston Ins. Co. v.Security Assurance Co., 715 F. Sup. 1405, 1412 (N.D.Ill. 1989). There the court said: "Clearly the policy uses the term "in its common and common sense usage: an effort by a third party to recover money from the insured." In National Casualty Co. v. Great Southwest Ins., 833 P.2d 741
(Colo., 1992) the court was faced with a claims made policy that did not define the word "claim". The court said it was an issue of first impression in Colorado and noted that "the majority of courts have interpreted a claim as a demand for something as a right." Id., p. 744. CT Page 15465 The court there was coverage under the Great Southwest policy because a city employee made a claim as so defined within the insurer's policy term, Id. p. 745, (case involved dispute between two companies as to which one was obligated to reimburse the city — both had issued claims made policies in consecutive periods. Also see City of Marion v.national Casualty Co., 411 N.W.2d 370, 373-74 (Iowa, 1988); Williamson Vollmer Eng. Inc. v. Sequia Ins. Co., 134 Cal.Rptr. 427, 431 (1976);State of North Carolina, ex rel. v. Beacon Ins. Co., 404 S.E.2d 691
(1991) which also held that "a demand for relief . . . if sufficient to constitute a claim does not have to be in the form of a lawsuit." Id., p. 695; also see Phoenix Ins. Co. v. Sukut Construction Co.,186 Cal.Rptr. 513-15 (1982); California Union Ins. v. AmericanDiversified Savings, 914 F.2d 1271, 1276 (CA 9, 1991); Ins. Corp. ofAmerica v. Dillon, Hardamon Cohen, 725 F. Sup. 1461, 1468 et seq. (N.D.Ind. 1988).[1] The court could find only two cases which have held the word "claim" to be ambiguous where it was undefined in the policy. J.P. Link Co. v. Continental Casualty Co.,470 F.2d 1133 (CA 9, 1972) and Walker v. Larson St. PaulFire Marine Ins. Co., 727 P.2d 1323 (Mont. 1986) which relied on J.P. Link. They are not persuasive and in Walker
the net result of the court's ruling appears to be yes the word is ambiguous therefore we will not require a suit to be brought before a claim can said to be made under these claims made policies. Then the court appears to use its ambiguity finding to conclude that the actions of the plaintiff complaining about a lawyer's conduct and sent to the malpractice insurer were in fact a claim "although no official claim had been filed." The court thus ruled there was coverage against the insurer under the policy. Id. 1323.
In any event, the court accepts the majority view that the word "claim" is itself not ambiguous. By relying on the definition of "claim" adopted in these type of policies where the term has not been defined the court further concludes that the April 24, 1995 letter constituted a "claim" certainly in terms of the policy definition where the word was fully explained but also in terms of the word as used in the ERC application for the policy where as noted "claim" was not defined. The so-called Dmochowski letter was from a lawyer who succinctly laid out in rather lengthy format why she believed her clients had been treated inappropriately by the plaintiff's company, she made a demand for reimbursement and other damages, and she threatened immediate legal proceedings unless her clients' demands were not met within ten days. This is certainly a "claim" by any rational or understandable definition of the word. And it was made on April 24, 1995 when the National union claims made policy was in effect and when Mr. Steinberg knew or should have known it was in effect. When the Dmochowski letter was received by Mr. Steinberg, he knew that the ERC policy was not in effect and this is CT Page 15466 clear because at #21 of the application Steinberg himself noted that the National Union policy was in effect to May 10, 1995. Indeed at the end of the application it states that the signing of the document and even the tendering of a premium would not bind ERC to issue a policy of insurance. Thus, it is evident that whatever rights Mr. Steinberg might have against ERC would only become operative as to any claim made after May 10, 1995. At #19 of the application it states that "this policy will not apply to claims which any person proposed for this insurance is aware of prior to the effective date of the policy." On March 2, 1995, when he signed the ERC application he was not aware of the Dmochowski claim but this latter language described the scope of his protection under the policy so he must be held to know any "claim" that he was to be made aware of after he so signed the application but before May 10, 1995 would not be covered by the ERC policy. Up to this point of the analysis it would seem that a "claim" was filed prior to May 10, 1995, the language of the application for insurance, if read in a common sense was, would fairly apprise Steinberg of this fact and there would be no coverage under the ERC policy that was to be issued. Therefore, the fact that Steinberg did not receive the policy until after the beginning of its effective date is of no consequence — the application gave him notice of what a "claim" was by the common definition of that term.
But the plaintiff argues that the analysis should not stop here and has raised several other arguments which the court will now attempt to deal with.
 (4)
The plaintiff maintains that in addition to the fact that "claim" was never defined in the application the use of the "claim first made" language in the policy creates ambiguity which somehow should translate into a result that would require the Dmochowski claim to be covered. Steinberg did inform ERC of the suit filed by the Dmochowski's in late June or early July of 1995. This was clearly within the effective dates of the ERC policy; the argument is that ambiguity created by the use of the "claims- first made" language allows him to treat the filing of the suit as the "claim" for the purposes of the policy. This is not a reliance argument since the court's interpretation of the application would preclude such a position. The argument is really that the policy language — claims first made — gave Steinberg lesser rights or more exactly lesser coverage than could be garnered by reading the application alone or at the least enough ambiguity was created by the policy language to require that coverage be found here under the ERC policy.
When these type of policies were first developed it appears that the CT Page 15467 language used was to the effect that claims had to be made during the policy period. Later, the language was expanded to provide coverage for "claims first made" during the policy period. As noted in LegalMalpractice, supra, § 33.11, p. 328 this was a so-called "relation back provision" that in effect dealt with complications that may arise where different consecutive insured on claims made policies were involved with one insured. Such a provision meant that: "A claim may not be covered by the subsequent insurer because of a common provision that treats related claims as dating from the first one made." Thus there either was a claim against the first insurer or no claim at all. See for example, U.S. v. A.C. Strip, 868 F.2d 181 (CA 6, 1989); InternationalIns. Co. v. Peabody Intern Corp., 747 F. Sup. 477 (N.D.Ill., 1990);National Casualty Co. v. Great Southwest Fire Ins. Co., 833 P.2d 741
(Colo., 1992); Esmailzadeh v. Johnson Speakman, 869 F.2d 422 (CA 8, 1989); City of Marion v. National Cas. Co., 43 N.W.2d 370 (Iowa, 1989);National Union Fire Ins. Co. of Pittsburgh v. Baker McKenzie,997 F.2d 305 (CA 7, 1993); cf. Board of Education v. CNA Ins. Co.,647 F. Sup. 1495 (S.D.N.Y., 1986).
Interestingly, in the last cited case at 647 F. Sup. 1495, the court alluded to no policy language using the term "claim first made" but still held a claim was made in the first policy period because "under a claims made policy, such as the one in dispute here, the right to coverage is furnished only by the policy in existence at the time the claim initially was made." Id., p. 1508. As long as the underlying identity of the claim is the same where is the ambiguity? Could it seriously be argued that if a policy application just contained the word "claim" and a prior act endorsement also just used the word "claims", the insured might be led to think he or she could advance the same claim in one policy period and then if the claim was made again by a subsequent letter or by way of suit in a second policy period there would be coverage under the second policy as well? In other words, did the, addition of the phrase "first made" in the policy eventually issued here limit coverage expectations raised by the language of the application and the prior acts endorsement? This issue caused the court, at least, a great deal of difficulty and lead it to read more cases on claims made insurance than it ever would care to again. However, it is true that the plaintiff is a sophisticated insured and the Dmochowski claim remained the same from the first letter sent on April 24, 1995 through the follow up correspondence after May 10, 1995 and apparently the suit filed in June of 1995 was based on the same underlying claim first put forth in April. The court would find it unreasonable to conclude that under these circumstances Steinberg could have been led to believe he could in effect file this claim under his National Union policy which expired on May 10, 1995 and make the same claim against ERC because it was also advanced after that date. CT Page 15468
In any event, the court believes the language of the application precludes having any such concerns because it in effect accomplished the same result and communicated the same information to the insured as if the magic words "claim first made" were used. As noted in the application it specifically states the policy would not apply to any claims the prospective insured was aware of "prior to the effective date of the policy." (#19 of Application.)
The court concludes no ambiguity was created by the use of the words "claim" or "claims" in the application and prior act endorsement as opposed to the "claims first made" language in the policy. The application for insurance, in other words, provides for no less "restrictive" coverage than the actual policy which used "claims first made" language. The need for such claims-first made language does not change the nature of claims made policies, which have been repeatedly upheld in numerous jurisdictions, but just defines coverage in a way that is especially fair to the insured since it makes clear to professionals who buy this insurance, often seriatim, from different companies that they should present claims to current carriers even though they are in the process of negotiating a new and similar type policy with a different carrier.
 (5)
As noted prior to the commencement of the policy period ERC sent to Newtown a letter referring to "prior acts exclusion" defining it as GPL 18A. This prior acts endorsement was attached to the policy and it read as follows:
 "It is agreed that notwithstanding policy provision to the contrary, this policy does not apply to claims against the Insured arising out of any negligent act, error or omission which occurred prior to 5/10/94."
The plaintiff appears to argue that this language is more expansive that the "claims first made" language of the policy — here only the word "claims" is used. The court as indicated rejects that argument. The prior acts endorsement must be read in conjunction with the application which effectively limits coverage as to claims in the same manner as the "claims first made" language.
But the plaintiff makes a much bolder claim than one confined to the ambiguity of language — he argues that "the failure to use the phrase "claims first made' in the retroactive endorsement means that the retroactive endorsement was to include "claims' from May 10, 1994 forward as opposed to claims `first made' prior to the ERC policy period (May 10, 1995 to May 10, 1996) as long as the act or omission occurred after CT Page 15469 May 10, 1994." It is an argument difficult to follow given the fact that the plaintiff also argues no "claim" was made prior to May 10, 1995, the effective date of the policy.
But in any event, the argument misses the point as to why these retroactive provisions have been included in claims made policies. Their genesis has nothing to do really with the separate aspect of these policies which concerns the provisions that claims be made or first made within the policy period. These retroactive endorsements were put in claims made policies because some commentators and courts indicated and held that claims made policies without retroactive coverage or sufficient retroactive coverage would be violative of public policy. The leading case is Sparks v. St. Paul Ins. Co., 495 A.2d 406 (1985). It said a policy without adequate retroactive coverage "combines the worst features of an "occurrence' and `claims made' policies and the best of neither. It provides neither the prospective coverage typical of an "occurrence' policy nor the retroactive coverage typical of a "claims made' policy." Id., p. 414. Accordingly, the New Jersey Supreme Court held that "where there has been no proof of factual circumstances that would render such limited retroactive coverage both reasonable and expected a "claims made policy' that affords no retroactive coverage whatsoever during its initial year of issuance does not accord with the objectively reasonable expectations of the purchasers of professional liability insurance." Id., p. 415.
Retroactive endorsements like the one in issue say nothing about when the claim should be made — it of course has to be made in the policy period. What they do accomplish is to make clear that although the claim must be made within the set policy period, the occurrence giving rise to the claim need not also occur within the same period — something a court like Sparks would not accept. In fact, some jurisdictions are so enamored of claims made policies that they find nothing wrong with policies that require the occurrence giving rise to the claim and the claim must transpire within the policy period and thus disagree with Sparks. See Stine v. Continental Casualty Co.,349 N.W.2d 127, 138 (Mich., 1984); Gereboff v. Home Indemnity Co,383 A.2d 1024, 1028 (RI, 1978); see cases cited in Sparks
at 495 A.2d, p. 411.
The prior act endorsement was a cautionary exercise by ERC in a jurisdiction like Connecticut which has not yet ruled on the appellate level as to the viability of claims made policies let alone such policies having no retroactive coverage. The language itself, however, creates no ambiguity as to when claims have to be made and has no effect on the operation of claims first made language as such. CT Page 15470
In other words, any fair minded reader of the prior acts endorsement would understand it to say this policy will cover all claims made between May 10, 1995 and May 10, 1996 but the act or error on which the claim is based is not limited to that period. That is, the policy also will cover claims submitted in the policy period even if the act or error on which the claim is based arose between May 10, 1994 and the date of our policy. It would be unreasonable and in effect turn this policy into a truncated "occurrence" policy to say that the endorsement permitted coverage for any act or error from May 10, 1994 to May 10, 1996 irrespective of when the claim was made in relation to the actual policy period. If that was the intention, why use the word "claims" in the endorsement at all? And given the fact that "claims" was used the endorsement must be read with all the other relevant documents — the application and the policy — and nothing in the language of the endorsement read alone or with these documents suggests anything else than a claim must be filed within the policy period.
Mr. Steinberg did not pay for this broader coverage and he should not receive it.
Or perhaps to put it more simply, despite the plaintiff's protestations to the contrary, the endorsement did not provide coverage for acts after May 10, 1994. It can only be read as saying that even though an act occurred between May 10, 1994 and May 10, 1995, which is before the effective date of the policy, we will cover a claim based on such an act. But as to when the claim itself must be filed that must be done during the policy period. If that is not the fair and perfectly understandable reading what on earth does it mean to say in a claims made policy that its effective date is between May 10, 1995 and May 10, 1996?
 (6)
The plaintiff cites several cases on the issue of an insured's duty to give "prompt notice" of any claim being made and cites several cases that stand for the proposition that despite any such language in a policy an insured has reasonable time to give notice. The plaintiff thus appears to argue that insofar as ERC denied coverage for failure to give prompt notice of the Dmochowski claim, ERC violated its contract of insurance coverage. National Semiconductor v. Allendale Mutual Ins. Co.,549 F. Sup. 1195, 1199 (Conn., 1982); Zieba v. Middlesex MutualAssurance Co., 549 F. Sup. 1318 (D.Conn. 1982); United TechnologiesCorp. v. American Home Assurance Co., 989 F. Sup. 128, 137-38
(D. Conn., 1997). It is argued that issues of material fact are presented by this case concerning notice and the adequacy of notice and that therefore summary judgment is not appropriate. CT Page 15471
But his case is not dependent on the issue of notice or reporting of a claim by the insured. It is true that notice of claims is critical in claims made policies: "The purpose of notice of claims within the time period set by the claims reporting requirements is to provide the insurer with the knowledge that after a certain date the insurer will no longer be liable under the policy." Insurance Law Practice, Vol. 8, Appleman, Supplem. 1996-1997 § 4731, p. 1. In fact, it has been said that "The essence, then, of a claims made policy is notice to the carrier within the policy period. Gulf Ins. Co. v. Dolan, Fortig Curtis,433 So.2d 512, 514 (Fla. 1983).
All of this is very interesting but it is not relevant to the issues before the court. Coverage is not being denied because of failure to give prompt notice of a claim within the policy period. Coverage is being denied because the claim was made before the effective date of the policy which is a predicate to any issue of notice of the claim under this type of policy.
 (7)
The plaintiff also argues that the policy should be read as placing a layer of qualification on the word "claim" and ERC violated its obligations by not doing so. Mr. Steinberg in his affidavit and his responses to the Dmochowski lawyer appears to have firmly believed the claim being made against him was groundless. He cites policy language to the effect that the Insured shall give prompt notice to ERC of:
 "(a) any claim made and of any action or suit commenced against the insured, and
 (b) any proceeding, event or development which in the judgment of the insured might result in a claim against the insured." (Section X of ERC Policy.)
Ignoring subsection (a) Steinberg argues that it is important to note that the policy language of subsection (b) left it to the "judgment of the insured to make the initial determination as to whether any proceeding, event or development might result in a claim" against him. New York authority is cited where in Beach Haven Apartments v. Allcity Ins.Co., 581 N.Y.S.2d 689, 690 (App.Div., 1992) it was held that the insured's good faith belief that it is not liable will excuse a failure to give timely notice if the belief is reasonable under all the circumstances." Also see Empire City Subway Co. v. Greater New YorkMutual Ins. Co., 358 N.Y.S.2d 691, 694 (Ct. of App. 1974); also see (Collins v. Isakeson, 633 N.Y.S.2d 539 (1995); Public Service Mut. Ins.Co. v. Levy, 395 N.Y.S.2d 1, 2 (App.Div. 1977). CT Page 15472
But again, this is not an adequacy of notice case but a coverage case. Subsection (a) states prompt notice must be given of any claim. The court has concluded a claim was, in fact, made here, but unfortunately for the plaintiff was made before the effective date of the policy period. As previously discussed, the claims first made language of the policy and the qualifying language in the application accomplishing the same result as the policy language precludes coverage under the ERC policy for any claim made prior to the effective date of the policy. In International Ins.Co. v. Peabody International Corp., 747 F. Sup. 477 (N.D.Ill., 1990), an insured Peabody had certain demands made against it by a company named Santee Cooper. The insurer in a claims made policy argued that there was no coverage since claim was made against the insured prior to the effective date of the policy. The court at page 480 said:
 "Peabody's actual or constructive knowledge regarding the potentiality for the Santee Cooper claim is not relevant to when the claim was first made as Peabody asserts. Peabody's response to the demands by Santee Cooper in November, 1984, is that Peabody reasonably believed that Santee Cooper was only "posturing for settlement." Whether or not Peabody believed, reasonably or otherwise, that the claim was "nothing more than a negotiating ploy, ' is not relevant to the issue of when a claim was first made because the insurance policy defined the term `claim' without reference to the belief of Peabody as to whether a claim was made. See Evanston Ins. Co. v. Security Assur. Co., 715 F. Sup. 1405, 1414 (N.D.Ill., 1989)."
This has to be the right result and an insured should not be permitted to shift coverage to a subsequent claims-made insurer just because he believes that what is indisputably a claim — a demand for money or services — is baseless. Where an actual claim, as so defined, is involved we are not dealing with a gray area such as a situation where some act occurs and reasonable people may disagree as to whether a claim will arise.
To approach the issue from another perspective, it has been said that:
 "The obvious advantage to the underwriter issuing `claims made' policies is the ability to calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point, usually the policy termination date. . . . This may result in CT Page 15473 lower rates for the insured. . . ." Zuckerman Nat. Union Fire Ins., 495 A.2d at p. 399-400. Also see "Professional Insurance," UCLA Law Review, Vol. 22, page 925. at page 928.
If the foregoing underlines the prospective advantages of claims made policies, it is just as clear that where an actual claim has been made before the effective date of the policy there is no coverage even if at the time the claim was made the insured thought the claim was baseless. How could the insurer rationally allocate reserves, and insureds in general receive thereby the benefit of lower premiums, if the insurer has to provide coverage on claims made before the policy period which, despite the insured skepticism, ripen into suits? or to put it another way, in a situation where there are a series of insurers, which is often the case in these claims made policies, why should a prior insurer like National Union in effect receive a boondoggle at ERC's expense at the whim of the insured who no doubt would be quite upset and rightfully so if an insurer for example manufactured a reason not to defend him or her on what is judged to be a baseless suit brought within the policy period.
 (8)
The plaintiff also argues that any rights as to coverage which the court might find as a result of his contract of insurance should not be lost because ERC did not receive notice of the Dmochowski suit until July, 1995. This is so, argues the plaintiff, because "ERC was not prejudiced by the fact that it received notice of the Dunchowski allegations" on that date. It points to Mr. Steinberg's affidavit as establishing a factual basis for the no prejudice claim and relies on the case of Aetna Casualty Surety Co. v. Murphy, 206 Conn. 409 (1988). That case held that where there has been delay in giving the insurer notice of an accident or claim . . ., "a proper balance between the interests of the insurer and the insured requires a factual inquiry into whether, in the circumstances of a particular case, an insurer has been prejudiced by its insured's delay in giving notice of an event triggering insurance coverage. If it can be shown that the insurer suffered no material prejudice from the delay, the nonoccurrence of the condition of timely notice may be excused because it is not, in Restatement terms, "a material part of the agreed exchange' . . .", id. pp. 417-418. The plaintiff also cites Security Mut. Ins. Co. of N.Y. v. Acker-FitzsimmonsCorp., 340 N.Y.S.2d 902 (1972), and Eveready Ins. Co. v. Levine,
536 N.Y.S.2d 87 (1988), for the proposition that an insurer needs to establish that it was prejudiced by the conduct of the insured in order to prevail on a summary judgment motion. The court is not quite sure these New York cases stand for the proposition claimed but there is still CT Page 15474Aetna Casualty Surety Co., and even assuming the plaintiff is correct in his characterization of the New York cases, all of these cases have one thing in common cursory reading of them reveals that they concern the interpretation and ambit of "occurrence" policies not "claims made" policies.
In a "claims made" policy, the obligation of the insurer only to cover claims made during the policy period is "material" to the agreement of the parties for all the reasons stated in fact, it is the essence of the insurance agreement which permits insurers to rationally estimate appropriate reserves and thus allow lower rates on insurance for professionals.
The court has read scores of cases involving claims made policies and brief descriptions of hundreds in ALR articles, Am.Jur. sections and various commentaries. The court could not find any case where, it having been posited that a claim was made before the effective date of the policy period — as the court has concluded here — coverage was allowed or the matter even discussed on the basis of some notion that the insurer should still cover the claim because it would not be prejudiced in its ability to contest it. Why is that? The simple answer is that would be converting a "claims made" policy into an "occurrence" policy and the insured not having bargained for such coverage or paid the premium is not entitled to it.
The only roughly analogous problem arises in cases where in claims made policies the act of negligence for example occurs during the policy period or a retroactive period, a claim or suit is brought within the policy period but the claim is not reported to the insurer until after the effective date of the policy period. The insured in such cases argue that they should be covered citing to the so-called notice/prejudice rule to the effect that "the breach of a policy provision by an insured cannot provide a valid defense to the insurer unless the insurer substantially was prejudiced by the breach," Burns v. International Ins. Co.,929 F.2d 1422, 1424 (CA. 9, 1991). In Burns, "the insurer (was) only responsible for claims made during the term of the policy or resulting from events or circumstances that could lead to a claim, concerning which the insurer is notified within the term of the policy plus sixty days." The parties agreed that "the insured did not provide notice to the insurer within the described notice period," id. p. 1424. The Burns court and every other court this writer could find have held that the so-called notice/prejudice rule does not apply to claims made policies in this situation. Diluglio v. New England Ins. Co., 959 F.2d 355, 359 (CA. 1, 1992); Employer's Reinsurance Corp. v. Sarris, 746 F. Sup. 560
(E.D.Pa., 1990); Brumfield v. Shelton, et al, 831 F. Sup. 562, 566 (E.D.La. 1993); City of Harrisburg v. Intern Surplus Lines, Inc., 596 F. Sup. 954, CT Page 15475 960 (M.D.Pa., 1984); Burns v. International Ins. Co., 709 F. Sup. 187,190-191 (N.D.Cal. 1989); Thoriac Cardiovascular Assn. LD v. St. PaulFire Ins. Co., 891 P.2d 916, 920 (Ariz. 1995); Safeco Title Ins. Co.v. Gannon, 774 P.2d 30, 34 (Wash.App. 1989); Hausbroock v. St. Paul Fire Marine Ins. Co., 511 N.W.2d 364, 368 (Iowa, 1993); Campbell's Co. v.Utica Mutual Ins. Co., 820 S.W.2d 284, 286 (Ark. App, 1991); Slater v.Lawyers Mutual Ins. Co., 278 Cal.Rptr. 479, 484 (Cal, 1991); Chas. Mainv. Fireman's Fund Ins. Co., 551 N.E.2d 28, 30 (Mass. 1990); Sletten v.St. Paul Fire Marine Ins. Co., 780 P.2d 428, 430 (Ariz. 1989). The courts have given various reasons for not applying the notice (prejudice rule) in the factual context which we have been discussing. In Brumfieldv. Shelton, at 831 F. Supp. p. 566, the court said:
 "The application of the prejudice rule here would negate the purpose of the claims made policy by creating insurance coverage for which the parties did not contract."
In Chas. Main, Inc. v. Fireman's Fund Ins. Co., at 551 N.E.2d at page 30, the court said:
 "A requirement that an insurer on a claims made policy must show that it was prejudiced by its insurer's failure to report a claim within the policy period or stated period thereafter would defeat the fundamental concept on which claims made policies are premised. The likely result would be that claims made policies, which offer substantial benefits to purchasers as well as insurance companies, would vanish from the scene."
These observations are just as telling, if not more so, when some form of lack of prejudice rule is being advanced as a reason for the insurer to cover a claim made before the effective date of the policy.
In City of Harrisburg v. Intern Surplus Lines Ins., at 596 F. Supp., page 961, the court says:
 "The notice provision of a claims made policy is just as important to coverage as the requirement that the claim be asserted during the policy period. If the insured does not give notice within the contractually required time period, in the instance case, "during the policy period, ' there is simply no coverage under the policy."
Exactly, the claim was not asserted during the policy period but had CT Page 15476 been asserted before that period; of course, such a policy requirement for coverage is "material" to a claims made policy, that is, what they are all about — thus, the reasoning of Aetna does not apply.
The court concludes that as to what might be called traditional breach of contract claims which have been discussed in the foregoing part of this decision, ERC did not breach any contractual duty to defend the claim or to provide a defense to the Dinockowski claim. But we are not through because the plaintiffs Steinberg and ITC make other allegations under their breach of contract theory which arise in other legal claims they make and might as well be discussed at this point.
 (9)
In what might be called a potpourri of other breach of contract claims the plaintiffs ITC and Mr. Steinberg have made several other allegations all of which cannot withstand the defendant's motion for summary judgment.
 (a.)
It is claimed that ERC failed to provide "tail coverage." The word "tail" and "tail coverage" is bandied about the depositions and used in the plaintiff's brief but it is difficult to comprehend the thrust of this claim as it relates to breach of contract.
"Tail coverage" has a specific meaning in claims made policies which has nothing to do with any issue before the court. The problem with "occurrence" policies is that there can be a long "tail" beyond the end of the policy period- the tail being the lapse of time between the occurrence (within the policy period) and the time when the claim is made against the insured. The companies have to provide coverage as long as the event happened within the policy period.
The advantage to insurers in claims made policies is the fact that there is no open-ended "tail" after the expiration of the policy — in fact, there is no tail since the claim must be made within the policy period, see generally, Gulf Ins. Co. v. Dolan. Fertig Curtis,433 So.2d 512, 515-5 16 (Fla. 1983).
This, however, could work unfair results. Courts have been concerned about so-called eleventh hour claims which the insured had no opportunity to report to the company within the policy period and some courts have suggested that by judicial fiat some reasonable time after the policy period be given to the insured to notify the insurance company, see Breauxv. St. Paul Fire Marine Ins. Co., 326 So.2d 891, 892 (La.App., 1976), CT Page 15477 although this approach was soundly rejected in Gulf Ins. Co.,433 So.2d at pp. 515-516.
In any event, to deal with the eleventh hour claim problem in claims made policies, companies have provided "tail coverage." One type of quasi-tail coverage noted by the Gulf Ins. Co. court at page 517 is to provide an endorsement allowing claims otherwise covered to be reported within a set time after the policy period. Another type of tail coverage "extends the time within which a claim may be made after the cancellation or expiration of a particular claims made policy. Tail coverage provides insurance protection for acts, errors or omissions that occurred while the initial claims made policy was in effect so long as a claim is asserted before the expiration of the tail period," Home Ins. Co. v. LawOffices of Jonathan DeYoung, et al, 32 F. Sup.2d 219, 224 (E.D.Pa., 1998), cf. Ballon v. Phico Ins. Co., 875 P.2d 1354, 1357 (Colo., 1993).
The provision of tail coverage or the failure to so provide it has nothing to do with any claim against ERC. There was no coverage under the ERC policy because a claim was made before the effective date of the policy, not because of the situation that presented itself after cancellation or termination of the policy.
The court has examined the National Union Policy that covered ITC against claims first made between May 10, 1994 and May 10, 1995. There was a claim made here on April 24, 1995, two and one-half weeks before the expiration of the National Union policy. This is no "eleventh hour" situation; Mr. Steinberg had ample time to inform National Union of the claim being made against him by the Dmochowski.[2] Even if somehow or in some way it were to be held that it would be unfair to have required Steinberg to report the Dmochowski claim in the final days of the National Union policy, that would be an argument for extending the reporting requirement under the National Union policy not for expanding coverage under the ERC policy. Steinberg knew the ERC policy did not become effective until May 10, 1995. And how on earth could Newtown Insurance Service be considered an agent of ERC for the purpose of determining whether it erred in not offering tail coverage on the National Union policy for which National Union would get a premium?
 (b)
The plaintiff in its July 16th amended complaint alleges that it failed to advise the plaintiff of the limitations of coverage due to the change of carriers from National Union to ERC; this was an unfair and/or deceptive act. These allegations are somewhat related to the allegations that ERC misrepresented coverage to induce Steinberg's coverage to lapse under the ERC policy including coverage for past acts. Misrepresentations CT Page 15478 were made regarding the conditions or benefits in the ERC policy for the purpose of inducing the plaintiff to forfeit or surrender its policy and/or allow it to lapse.
These claims against ERC are based on several premises set forth in the Steinberg affidavit. He assumes that Newtown is the agent of ERC for the purpose of binding the latter as to the scope of coverage under the ERC policy. Steinberg said Newtown told him he had prior acts coverage. Basically, Steinberg maintains that he always had the same insurance agent, Newtown, and despite the fact that he was assured he had prior acts coverage from ERC when Newtown shifted coverage from National Union to ERC both carriers denied coverage when suit was brought. Steinberg's position is that he always had insurance in place. At paragraph 40 Steinberg states that his firm's real estate coverage "through no decision of his own, was transferred from one insurance company to another. The latter carrier (the defendant ERC) was to provide specifically for prior acts coverage and to take National's place. There is no time lapse in coverage."
There are several problems with this argument. For one thing, the defendant argues that Steinberg's affidavit is conclusory and has attached to it several unauthenticated letters and documents. For the purposes of discussion, however, the court has considered the attached documents and exhibits to the Steinberg affidavit.
The plaintiff regards Newtown as the agent of ERC. It has submitted numerous letters from ERC to Newtown personnel stating it would be necessary for Newtown to be appointed agent for ERC and has presented forms to be submitted to the state to confirm such an agency relationship. As noted, the defendant takes great umbrage at what it perceives as unauthenticated letters. But it is no doubt true that Newtown is a separate entity from ERC, Newtown did broker the selling of the ERC policy to ITC so that Newtown must be considered the agent of ERC for the purpose of having people sign up for its policies. But there are agents and there are agents with varying degrees of authority and ability to bind their principals. of interest in the ERC letters to Newtown is the language, "The agency relationship between yourself and our Corporation will be limited in scope to the counter signature where necessary of the various policies which we have written or may in the future write for your insureds. Because the nature of our business requires us to appoint a multiplicity of agents, we ask that the name of our Corporation not be featured in any advertising or listed in letterheads or the like. If you are willing to serve in this limited capacity, we would appreciate your signing and returning the extra copy of the letter which is enclosed."
The just quoted language is consistent with the defendant's position CT Page 15479 and reference to two cases on the issue of agency as it applies here. InTeleco Oilfield Services Inc. v. Skandia Ins. Co., Ltd., 656 F. Sup. 753,757 (D.Conn., 1981) the court said, "In essence, in the course of the procurement and the subsequent performance of an insurance contract the broker acts as a dual agent. At first the broker is the agent of the insured, and then the agent of the insurer." In Passarello v. LexingtonIns. Co., 740 F. Sup. 933, 935 (D.Conn., 1990), the court said, "The broker is the agent of the insured in negotiating a policy and as such owes a duty of care to his (sic) principal (the insured)." In Lewis v.Michigan Millers Mutual Ins. Co., 154 Conn. 660, 664 (1967), the court said:
 "An insurance agent is a person expressly or impliedly authorized to represent an insurance company in its dealings with third persons. . . . An insurance broker is one who acts as a middleman between the insured and insurer and who solicits insurance from the public under no employment from any special company and who either places an order for insurance with a company selected by the insured, or, in the absence of such selection, with a company the broker selects. . . . It is clear from the record that Cahn was an insurance broker rather than an agent of the defendant.
 When procuring insurance for a person such as the plaintiff, a broker becomes the agent of that person for that purpose."
This is not a view confined to our state. North Carolina, Comm. ofIns. v. Beacon Ins. Co., 404 S.E.2d 691 (N.C.App. 1991), the court said:
 "Under Alabama law, an independent insurance agent who places coverage with various companies is a "broker' and not an agent of the insurer . . . Where the broker is the agent of the insured, the insured is bound by the acts of the broker within the scope of his authority as in the case of any other agent. And where a broker, employed by an insured to procure insurance, receives, reads and accepts a policy, the broker's knowledge is imputable to the insured . . . as is the failure of the broker to ascertain that the policy did not contain the provisions requested.
It would appear that Newtown was a broker in insurance parlance. It CT Page 15480 sought out policies for its clients after National Union indicated it would no longer offer policies. The "agency" reference in correspondence between ERC and Newtown just concerned Newtown's right and ability to broker the insurance — wherefore the limiting language in the letters quoted above.
It seems to follow from all this that any misrepresentations made by Newtown relating to the procurement of the policy were made while Newtown was acting for Steinberg. If Newtown made misrepresentations or omissions relating to instructions to Steinberg about ERC's responsibilities prior to the expiration of the National Union policy it is difficult to see how they were acting as agents for ERC. ERC merely authorized them to try to broker their policies as written.
Under certain circumstances, an insurance broker may become an agent of the insurer and the doctrine of apparent authority or estoppel can be applied, where appropriate, when the broker's authority to bind the insurer is at issue. Reserve Ins. Co. v. Duckert, 214 A.2d 754, 759
(Md., 1965). But there are no factual circumstances to suggest those doctrines should apply so as to bind ERC by any misrepresentations Newtown might have made. ERC sought a limited agency relationship with the Newtown and explicitly instructed the latter that it was not to inform the public that it was anything but a broker for its policies. The only direct communication by ERC with Steinberg was through the application for the insurance; the April, 1995 letter about the prior act coverage was sent to Newtown, not Steinberg.
But even if the court is incorrect in its analysis of the agency problem, there is a basic flaw in the misrepresentation claim. The predicate to the claim is that Steinberg was told he had prior acts coverage, this was misleading and if he, in fact, has such coverage, ERC should have protected ITC on the Dmochowski claim. But there is no indication that Dupuis or any other Newtown agent or officer represented the prior acts coverage to be anything other than what it is stated to be in the endorsement providing for such coverage. For reasons previously stated, the court does not believe that the endorsement changed the policy into a truncated occurrence policy as Steinberg's interpretation would dictate. The prior acts endorsement, as noted, merely provided that claims made within the ERC effective policy dates would be covered even if the acts or events giving rise to the claims arose after May 19, 1994, but not if they arose before. This was for the insured's benefit and the provision removed the necessity for tail coverage under the National Union policy.
What a plain reading of the application and the prior acts endorsement makes clear, however, is that Steinberg was fully informed that for ERC CT Page 15481 coverage to be triggered, a claim had to be made within the ERC policy period. or to put it another way, any other interpretation would be unreasonable in light of the fact that the application for insurance alone made it clear that a claims — made policy was being offered. Merely because Steinberg was told he had something called "prior acts coverage" cannot be reasonably interpreted by him as allowing claims to be filed before the effective date or the ERC policy let alone turn the policy into an occurrence policy for the period of May 10, 1994 to May 10, 1995, taking National Union out of the picture for coverage purposes.[3]
Oddly enough, Steinberg seems to realize this at a certain level. He protests in his affidavit that he always was led to believe he had insurance in place. He now claims there was a lapse in such protection because of the change of carriers. If all of that is so, why does Steinberg feel compelled to at the same time argue vigorously that the Dmochowski April 24, 2000 letter — while the National Union policy was in effect — was not a "claim." He does so because if the Dmochowski letter is, in fact, a "claim," then there was coverage under the National Union policy, there was therefore no lapse in effective coverage and these consecutive policies were in place to operate just as they were intended to operate. The court has concluded there was such a claim filed on April 24, 2000; the plaintiffs find themselves in the unfortunate situation they do because the claim was not filed with National Union within the terms of that carrier's policy period and the court cannot find ambiguity or misrepresentation where no evidence of such has been presented. Accordingly, the court grants the motion for summary judgment as to the breach of contract count.
 B.
As indicated, the plaintiffs make several other claims in addition to the breach of contract claim. There is a claim against ERC for negligence, breach of fiduciary duty, and violations of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA).
 (1.)
The counts against ERC alleging negligence and breach of fiduciary duty rest on the same factual allegations. They are set forth in the sixth count (negligence) and adopted in the count (breach of fiduciary duty). It is alleged that ERC was at fault under the theories of liability in that.
 (a) it failed to fully inform the plaintiff(s) as to CT Page 15482 how to insure against claims arising from acts or occurrences prior to May 10, 1995; and/or
(b) it failed to defend such claim; and/or
 (c) it was negligent in breaching the obligations of the contract under the policy in providing a defense; and/or
 (d) it failed to advise the plaintiff of the limitations of prior coverage with respect to prior acts or claims; and/or
 (e) it failed to advise the plaintiff of the limitations of subsequent coverage with respect to prior acts or claims; and/or
 (f) it failed to advise the plaintiff to purchase "tail" coverage in order to cover acts and/or business transactions that occurred prior to changing carriers; and/or
 (g) it engaged in an unfair and/or deceptive act or practice in advising the plaintiff regarding coverage upon changing insurance carriers; and/or
 (h) it misrepresented, by act or omission, the coverage required by the plaintiff when changing insurance companies; and/or
 (i) it misrepresented coverage for the purpose of inducing or tending to induce the plaintiff's coverage to lapse; including but not limited to tail coverage; and/or
 (j) it misrepresented coverage for the purpose of inducing or tending to induce the plaintiff's coverage to lapse under the new policy, including, but not limited to, tail coverage; and/or
 (k) it made written and/or oral statements, misrepresented regarding the terms or conditions or benefits contained in the policy for the purpose of inducing the plaintiff to forfeit or surrender its policy and/or allow it to lapse; CT Page 15483 and/or
 (l) it violated § 38a-826, § 38a-815, § 42-110, et. seq., of the Connecticut General Statutes.
Many of these matters have been previously discussed.
As to subparagraph (a), ERC had no duty to advise Steinberg about coverage as to matters not included in the protections afforded by this claims-made policy. The prior acts endorsement explicitly informed Steinberg that he would receive an added benefit that, as previously discussed, some courts do not feel is required — that is, that he could make a claim during the effective dates of the ERC policy even though the claim arose out of an act or occurrence that happened prior to the effective policy date, to wit, from May 10, 1994 to May 10, 1995. ERC had no duty to inform Steinberg that its policy was a claims made and not an occurrence policy when the application, prior acts endorsement and actual policy language made that clear.
As to (b) and (c), the court has concluded ERC had no duty to defend and/or cover the Dmochowski claim. Concerning (d), there were no limitations of prior coverage caused by the change of carriers. These policies were typical consecutive claims made policies; Steinberg could and should have submitted what was in fact a "claim" under the National Union policy to that carrier.
There were no limitations on subsequent coverage "with respect to prior acts or claims" (e). The National Union and ERC policies were claims made policies not occurrence policies and Steinberg and ITC were only entitled to the coverage that they paid for. If an act giving rise to a claim and
the claim occurred prior to the effective date of the policy that was not a "limitation" having anything to do with the reasonable expectations that a person or business applying for ERC coverage could hold against ERC, it was a consequence flowing from the nature of and a reasonable interpretation of the ERC application, prior acts endorsement, and actual policy. And no "limitation" can be fairly said to exist in that Steinberg had effective and rather standard claims made policies with National Union and ERC and his rights and interests would have been fully protected if he had simply brought the Dmochowski claim to the attention of National Union.
"Tail coverage" (f) is not relevant to any issue before the court as previously discussed. As to the allegations in (g) and (h), they fail for the same reasons that (d) and (e) do. CT Page 15484
As to the allegations of (i), (j) and (k) there was no lapse of coverage. The plaintiff continues, in the court's opinion, to fail to recognize that in these consecutive claims made policies one carrier rather than another may be responsible for coverage depending on when a claim is made but that does not translate, globally speaking, into an overall lapse of coverage. The insured simply has to make his or her or its claim to the appropriate carrier. The only problems that have arisen with these policies is the "eleventh" hour claim situation where an insured may not have type to file the claim with the appropriate carrier or the situation where a professional is retiring and there is a real need for some type of tail coverage or a hybrid occurrence — claims-made type policy. Neither of these situations exist here.
Allegation (1) is conclusory and appears to rely on the previous allegations set forth in (a) through (k).
As to all these allegations, the plaintiffs also maintain that an agency relationship existed between Newtown and ERC and any misrepresentations, actions, failures to act, advice and failure to give advice of Newtown which might form the basis of a negligence or breach of fiduciary duty claim can be laid at the doorstep of ERC. For reasons previously stated, the court does not accept the agency argument as broadly made by the plaintiffs.
But even if the court is incorrect in this analysis, it appears that the only concrete allegation that can lie against ERC through any agency relationship with Newtown involves the prior acts endorsement and communications allegedly made by Newtown people to Steinberg. Again, there is no claim that Steinberg was told anything different from what the language of the prior acts endorsement actually said. If he was generally told you have prior acts coverage, it was made in the context of the fact that he had a claims made policy being offered to him. The actual endorsement when attached to the policy made it unambiguously clear that ERC was offering him a protection under its policy that it might not have had to offer him — claims could be made under the ERC policy even if acts giving rise to the claim occurred up to a year before the effective date of the policy. In talking of the justifiable reliance element of a misrepresentation claim, Prosser makes a comment appropriate to this case:
 "The plaintiffs conduct must not be so utterly unreasonable in the light of the information apparent to him, that the law may properly say that his (or her) loss is his (or her) own responsibility."
The plaintiff's interpretation of these prior acts endorsements, if CT Page 15485 accepted, would lead to their withdrawal by carriers. Given the fact that some courts have held that the retroactive protection they sought to offer was not mandated, such a view, if accepted here, would lead to worse coverage and/or higher premiums for all professionals.
The court grants the defendant's motion as to the negligence and breach of fiduciary duty counts.
 (2.)
There are also counts alleging CUIPA and CUTPA violations asserted in counts 15 and 17. Count 17 incorporates all the factual allegations set forth in the negligence and breach of fiduciary counts. Count 15, at paragraph 24, in various subparagraphs sets forth allegations made in those just mentioned counts and in subparagraph (c) upon close examination incorporates allegations made in those two common law counts and discussed in the court's decision on the breach of contract count. The court sees no useful purpose to be achieved by repeating that discussion.
Paragraph 23 contains allegations broadly referencing the allegations just referred to but makes an allegation not referenced elsewhere. It states there was a "failure to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies." This appears to be unfair claims settlement practice allegation.
There appears to be no factual basis for this claim offered in the materials presented to the court. As pointed out in the defendant's first brief, there appears to be no dispute over the fact that Ms. Olmstead of ERC responded within three days of receiving a call from Mr. Steinberg — she informed him in a lengthy letter dated July 24, 1995, that there was no coverage for his claim and explained at length why this was so under the policy.
Furthermore, the court has concluded that the denial of coverage by ERC was justified.
In addition, the plaintiff has cited Lees v. Middlesex Ins.,229 Conn. 842, 847-849 (1994). At page 849, the court stated in unequivocal language that: "In requiring proof that the insurer has engaged in unfair claim settlement practices "with such frequency as to indicate a general business practice, ' the legislature has manifested a clear intent to exempt from coverage under CUIPA isolated instances of insurer misconduct." Even assuming a three-day delay in responding to a claim was inappropriately long under appropriate claim settlement CT Page 15486 practice — a proposition beyond the limits of rational criticism of appropriate insurer behavior — there is no evidence that such "delay" was part of a general pattern of ERC behavior. It also follows from Lees that this specific claim therefore cannot support a CUTPA claim.
Similarly, none of the other allegations made in their complaints can provide a basis for a claim under either of these two statutes as these allegations were previously discussed by the court.
The court, based on the foregoing, will grant the defendant ERC's motion for summary judgment. The coverage offered by ERC was clear and unambiguous; there were no misrepresentations made that would have misled the plaintiffs on this score and none by ERC. The nature of claims made coverage provided by different companies in consecutive periods ensures no lapse of coverage especially when prior acts endorsements such as the one issued here are provided. Thus, it cannot be claimed that the insurance coverage plans offered by companies like National Union, ERC are misleading when either viewed together or examined individually in light of the issuance of consecutive policies by different earners.
The court is not prepared to find ambiguity or misrepresentation in the context of the arguments made in this case by the plaintiffs simply because of the unfortunate situation the plaintiffs find themselves in — a situation of their own making.
To do so would in effect place an interpretation by court diktat on claims made policies which would seriously harm the broadly recognized benefit they offer to insured and insurer.
The ERC motion for summary judgment is granted.
Corradino, J.